IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL JOSEPH PRATT,

    Petitioner,               No. 2:02-cv-0872-MCE-JFM (HC)

   vs.

MIKE EVANS, Warden,

    Respondent.           <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

       Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges on several grounds his 2000 conviction on charges of second degree murder with use of a firearm. This action is proceeding on petitioner's second amended petition, filed August 4, 2005.

### FACTS[1]

> On November 8, 1998, [petitioner] was at the residence of his cousin, Timothy Carver (Carver), using the telephone to arrange a ride to Reno, Nevada, where he had a November 12, 1998, court date in a criminal matter. Later that day, [petitioner] entered Carver's residence unannounced and became angry and argumentative with Carver's wife, Renae Carver. [Petitioner]

---

[1] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in <u>People v. Pratt</u>, No. C036203 (July 30, 2001), a copy of which was lodged by respondent on January 11, 2006 as Lodged Document 7.

1

implied that she had given wrong directions to an individual who was planning to take him to Reno. Carver told [petitioner] to leave the residence and picked up the telephone to call the police. A shot rang out. When [petitioner] turned around, Renae saw that he was holding a chrome gun with a pearl or white handle. [Petitioner] had acquired the gun a couple of weeks earlier during one of several burglaries he had committed with Carver.

Renae telephoned 911 and police arrived shortly thereafter. Paramedics found Carver lying on the floor. He was conscious and able to speak. He was taken to hospital where he underwent surgeries, lapsed into a coma, and died several days later. [Petitioner] was apprehended in Reno.

[Petitioner] testified on his own behalf that he saw Carver coming at him from the kitchen to his left. Carver had a knife in his left hand. Carver said nothing but lunged at [petitioner] to stab him. [Petitioner] used his left hand to block and grab Carver's arm. They slammed into a wall where a blood smear is visible. [Petitioner] got knocked down to the area of Carver's knees. [Petitioner] saw a handgun lying next to a telephone; a quilt partially covered the gun. He picked up the gun in his left hand as Carver swung at him. [Petitioner] jumped back and the gun went off. [Petitioner] dropped the gun and ran out of the apartment.

People v. Pratt, slip op. at 2-3.

## ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

II. Petitioner's Claims

　　A. Reasonable Doubt Instruction

Petitioner's first claim for relief is that his federal constitutional right to equal protection was violated by the "essentially standardless" definition of reasonable doubt in CALJIC 2.90, the reasonable doubt instruction given at petitioner's trial. Second Amended Petition, at 7. The last reasoned state court rejection of this claim is the decision of the state court of appeal on petitioner's direct appeal, which rejected the claim as follows:

> [Petitioner] contends the trial court violated his federal right to equal protection when it instructed the jury with CALJIC 2.90, which, he claims, "*provides no adequate and uniform standard* for determining the level of certainty to which the jury must be persuaded . . . ." (Italics added.) An almost identical contention, that the instruction "*gave the jury no guidance* as to the level

/////

3

of certainty," was held to be frivolous in *People v. Hearon* (1999) 72 Cal.App.4th 1285, at pages 1286, 1287.[2]

[Petitioner] claims a result contrary to *Hearon* is now requires by the United States Supreme Court's landmark decision in *Bush v. Gore* (2000) 531 U.S. __, __ [148 L.Ed.2d 388, 399]. We disagree.

In *Victor v. Nebraska* (1994) 511 U.S. 1 [127 L.Ed.2d 582] the high court held that, "The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial court's from defining reasonable doubt nor requires them to do so." (511 U.S. at p. 5 [127 L.Ed.2d at p. 590].) Because no definition is necessary, the definition in CALJIC 2.90 cannot be challenged as inadequate.

None of the opinions in *Bush*, *supra*, 531 U.S. __ [148 L.Ed.2d 388], purports to reject *Victor*, *supra,* 511 U.S. 1 [127 L.Ed.2d 583], or to hold that trial courts must define reasonable doubt. It is fundamental that a case is not authority for an issue neither raised nor considered. (*People v. Wells* (1996) 12 Cal.4th 979, 984, fn. 4.)[3]

Rather, in *Bush*, *supra*, 531 U.S. __ [148 L.Ed.2d 388] the court majority carefully distinguished the election contest before it from the ordinary case in which a jury evaluates evidence at a criminal trial. In the election context, "The factfinder confronts a thing, not a person. The search for intent can be confined by specific rules designed to ensure uniform treatment." (*Id*. at p. __ __ [148 L.Ed.2d at p. 399].) Here, in contrast, the fact finder confronted numerous *persons* who appeared as live witnesses and had to decide "whether to believe [each] witness." (*Ibid*.) [Petitioner] does not argue that the assessment of credibility can be confined by a series of specific rules, as in *Bush*. Nor does *Bush* suggest that the next step in the process, the determination whether the facts found by the trier establish guilt beyond a reasonable doubt, is "susceptible to much further refinement" through "specific rules designed to ensure uniform treatment." (*Ibid*.)[4]

---

[2] [Petitioner] claims that *Hearon*, *supra*, 72 Cal.App.4th 1285 upheld CALJIC No. 2.90 against a due process challenge, not an equal protection challenge. In fact, *Hearon* did not mention due process or equal protection.

[3] In another context, [petitioner] admits that *Bush*, *supra*, 531 U.S. __ [148 L.Ed.2d 388] is sui generis.

[4] Justice Stevens's dissent did not call *Victor* into question. On the contrary, it argues there is "no reason to think that the guidance provided to the factfinders, specifically the various canvassing boards, by the 'intent of the voter' standard is any less sufficient – or will lead to results any less uniform – than, for example, the 'beyond a reasonable doubt' standard employed

4

> [Petitioner] contends that further refinement can easily be accomplished, but his only specific suggestion is that the jury "be informed that there are at least three standards of proof in the law, preponderance of the evidence, clear and convincing evidence, and proof beyond a reasonable doubt." The point has no merit.
>
> None of the closing summations in this case described the lesser standards of proof or related them to the standard of beyond a reasonable doubt. However, there mere omission of inapplicable standards from a particular case does not raise the specter that the applicable standard will be applied in an unequal manner. The jury had to decide whether the evidence placed [petitioner]'s guilt in doubt and whether that doubt was reasonable. The definitions of "preponderance of evidence" and "clear and convincing evidence" do not tell the jury how to determine whether a doubt is reasonable; they are not essential or even particularly helpful to that task. Their omissions from this case did not violate equal protection.

People v. Pratt, slip op. at 5-8.

The jury in petitioner's trial was instructed with CALJIC 2.90, as follows:

> A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.
>
> Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

Clerk's Transcript on Appeal (CT) at 237. In Victor v. Nebraska, 511 U.S. 1 (1994), the United States Supreme Court held that a reasonable doubt instruction "need not follow a prescribed formula, and . . . require[s] only that the trial court (1) convey to the jury that it must consider only the evidence and (2) properly state the government's burden of proof. See id. at 13, 114 S.Ct. at 1246, 127 L.Ed.2d 583. The Court specifically stated that: 'An instruction cast in terms

---

everyday by ordinary citizens in courtrooms across this county." (*Bush*, *supra*, 531 U.S. at p. ___ [148 L.Ed.2d at p. 411] (dis. opn. of Stevens, J.); fn. omitted.)
   The court's holding that the "intent of the voter" standard is insufficient does not disclose any belief that the beyond-a-reasonable-doubt standard is similarly inadequate.

5

of an *abiding conviction* as to guilt, without reference to moral certainty, correctly states the government's burden of proof.' Id. at 14-15, 114 S.Ct. at 1247, 127 L.Ed.2d 583 (emphasis added)." Lisenbee v. Henry, 166 F.3d 997, 999 (9th Cir. 1999). CALJIC 2.90, as given at petitioner's trial, meets these standards. Drayden v. White, 232 F.3d 704, 715 (9th Cir. 2000).

In Bush v. Gore, 531 U.S. 98 (2000), the United States Supreme Court held that "recount mechanisms" implemented in the State of Florida following a Florida Supreme Court decision requiring a recount of votes cast in the 2000 presidential election did not "satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right" to vote because of "an absence of specific standards" to ensure the equal application of the "basic command" to "consider the 'intent of the voter.'" Bush v. Gore, 531 U.S. at 105-106 (internal citation omitted). Nothing in Bush v. Gore in any way undermined the holding of Victor v. Nebraska, nor is there any clearly established United States Supreme Court precedent extending the holding in Bush v. Gore to jury trials. The state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. This claim should be denied.

B. Requiring Petitioner to Testify

Petitioner's second claim is that the trial court violated petitioner's Fifth Amendment privilege against self-incrimination by requiring him to testify in order to receive a jury instruction on self-defense, which was the primary defense theory. Petitioner presented this claim to the California Supreme Court in a petition for writ of habeas corpus filed in that court on May 19, 2004 and denied in an order filed June 8, 2005 that contains no statement of reasons for the decision. See Lodged Documents 10 and 11.

The facts relevant to this claim are as follows. After the defense had called seven witnesses, there was a lengthy discussion between the court, the prosecutor and defense counsel, out of the presence of the jury, as to whether there was sufficient evidence at that point to support
/////

a self-defense instruction. At the conclusion of the discussion the court took a recess to review cases submitted by counsel. Following the recess the court made the following statement:

> Having reviewed the evidence and the cases that have been submitted and referred to by counsel, at this point in the evidence, it does not appear that it would be appropriate to give the self-defense instructions. So that being the state of the evidence, I think that's the decision I have to make.
>
> So, Mr. Ross, you need to talk to your client about whether or not he wants to testify.

Reporter's Transcript of Proceedings (RT) at 486-487. Thereafter, petitioner took the stand and testified in his own defense, and the jury was subsequently instructed on both self-defense and imperfect self-defense.

Petitioner claims that the trial court's ruling "forced [him] to waive his Fifth Amendment privilege not to testify in order to exercise his constitutional right to a self-defense instruction despite the fact that there was sufficient, if weak, evidence that the shooting occurred in self-defense before [petitioner] testified." Traverse, filed February 6, 2006, at 11. The state court's findings concerning whether the evidence supports a self-defense instruction are entitled to a presumption of correctness in this federal habeas corpus proceeding. Petitioner is only entitled to relief on this claim, if at all, if the trial court's decision that there was insufficient evidence, without petitioner's testimony, to instruct the jury on self-defense was "'an unreasonable determination of the facts based on the evidence presented.'" Bradley v. Duncan, 315 F.3d 1091, 1096 (9th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(2)).

Under California law,

> [f]or killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. (*People v. Flannel* (1979) 25 Cal.3d 668, 674, 160 Cal.Rptr. 84, 603 P.2d 1.) If the belief subjectively exists but is objectively unreasonable, there is "imperfect self-defense," i.e., "the defendant is deemed to have acted without malice and cannot be convicted of murder," but can be convicted of manslaughter. (*In re Christian S.* (1994) 7 Cal.4th 768, 783, 30 Cal.Rptr.2d 33, 872 P.2d 574.) [Footnote omitted.] To constitute "perfect self-defense," i.e., to exonerate the person

>completely, the belief must also be objectively reasonable. (*Id*. at p. 783, 30 Cal.Rptr.2d 33, 872 P.2d 574; see also *People v. Aris* (1989) 215 Cal.App.3d 1178, 1186, 264 Cal.Rptr. 167.) As the Legislature has stated, "[T]he circumstances must be sufficient to excite the fears of a reasonable person...." ( Pen. Code, § 198; see also § 197, subds. 2, 3.) Moreover, for either perfect or imperfect self-defense, the fear must be of imminent harm. "Fear of future harm-no matter how great the fear and no matter how great the likelihood of the harm-will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." (*In re Christian S.*, supra, 7 Cal.4th at p. 783, 30 Cal.Rptr.2d 33, 872 P.2d 574, italics in original.)

People v. Humphrey, 13 Cal. 4th 1073, 1082 (1996). A jury instruction on self-defense "must be given upon request whenever the claim of self-defense has been properly tendered and the evidence warrants submitting the issue to the jury." People v. Adrian, 135 Cal.App.3d 335, 336 (Cal.App. 1982); see also Menendez v. Terhune, 442 F.3d 1012, 1028 (9th Cir. 2005).

The record reflects that there were a total of five people present when Carver was killed: Carver, his wife Renae, his father John Joseph Carver, Jr., Carver's infant son, and petitioner. Neither the testimony of Carver's wife nor the testimony of his father supported a finding that petitioner actually believed that he needed to defend himself against Carver.[5] Thus, the only other person present at the time of the shooting who could have offered testimony to support a self-defense theory was petitioner. The trial court did not require petitioner to testify or to give up his Fifth Amendment rights; the court found, correctly, that petitioner would not be entitled to an instruction on self-defense unless he offered testimony that supported the defense. The state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. This claim should be denied.

/////

---

[5] Petitioner contends that evidence of Carver's history of violence and possession of a knife as well as evidence of a fight between petitioner and Carver about two weeks prior to the shooting and the strained relationship between them after the fight were sufficient to support a self-defense instruction. However, at the time of the trial court's ruling nothing in either that evidence or the testimony concerning events at the time of the shooting were sufficient to suggest that when he shot Carver petitioner actually believed that he needed to defend himself.

C. Ineffective Assistance of Counsel

Petitioner raises several claims of ineffective assistance of trial counsel and one claim of ineffective assistance of appellate counsel. Petitioner presented these claims to the California Supreme Court in a petition for writ of habeas corpus filed in that court on May 19, 2004 and denied in an order filed June 8, 2005 that contains no statement of reasons for the decision. See Lodged Documents 10 and 11.

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. Id. at 690. The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id. "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice. Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Williams v. Taylor, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice
/////

. . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

The Strickland standards apply to appellate counsel as well as trial counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989). In order to demonstrate prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. Miller, 882 F.2d at 1434 n.9.

1. Failure to Investigate/Present Mental Health Defense

Petitioner's third claim for relief is that his trial counsel was ineffective in failing to "fully investigate and present a mental health defense." Second Amended Petition at 13.[6] Petitioner contends that he has a long history of mental illness and brain damage and that his trial attorney was on notice of this history but failed to conduct a sufficient investigation to make a proper assessment of whether a mental health defense should have been presented at trial. Petitioner also contends that he was prejudiced by counsel's failure to present the defenses of diminished actuality and imperfect self-defense, both of which would were supported by petitioner's history of mental illness.

In his declaration, petitioner's trial counsel, Eric Ross, averred that he "was aware of [petitioner]'s mental health issues" and that "[b]ased on the investigation conducted and conversations with [petitioner], [he] concluded that a mental health defense would not be successful and that the defense proffered at trial was appropriate." Ross Declaration at ¶ 2. At the evidentiary hearing, Ross testified that he had two psychiatric experts provide him with reports. Transcript of Proceedings, October 10, 2007, (hereafter EHT) at 15:14-24. He testified that he had learned about petitioner's "personal history, and his reporting of physical and mental

---

[6] This claim was the subject of an evidentiary hearing held before the undersigned on October 10, 2007. Three witnesses testified at the hearing: Eric J. Ross, petitioner's trial counsel; Fred Dawson, an attorney; and Dr. Natasha Khazanov.

abuse from his family, which along with his seizure history and mood swings, . . . need to be evaluated by a mental health care professional" in order to get "insight for purposes of preparing" petitioner's defense. Id. at 15:24-16:5. The focus of the evaluations were on petitioner's competence to stand trial, id. at 15:22-24; 18:8-9, although part of Ross' affidavit in support of funding for one of the experts involved seeking information about the availability of a mental health defense. Id. at 84:8-14. Ross received reports "containing abundant evidence that [petitioner] might have suffered from a variety of psychological conditions or disorders." Id. at 89:2-6. Ross also testified that petitioner "basically told [him] that this was an act of self-defense" and that petitioner's version of events remained "largely" consistent. Id. at 86:19-87:18. Ross' "best recollection" was that petitioner did not want to pursue a mental state defense. Id. at 105:8-11; see also id. at 145:15-20 (testimony of Dr. Khazanov that during cross-examination at trial petitioner "steadfastly denied any mental health problems.").

As a result of the criminal charges at issue, petitioner faced "an open count of murder with use of a firearm and he had allegations of two former strikes." Id. at 22:12-13. Thus, if convicted of involuntary manslaughter on a theory of imperfect self-defense, petitioner faced a sentence of 25 years to life in prison. Id. at 22:13-17. Based on the mental health information available to him and his conversations with petitioner, Ross opted to pursue a defense of straight self-defense, which, if successful, would have resulted in an acquittal. See id. at 40:10. Ross' first strategy was to present enough evidence that petitioner would not have to testify; once petitioner testified, Ross "believed that it was inconsistent to have mental health testimony proffered on his behalf when I was trying to portray him as a person that had an actual belief, and a reasonable belief that he was being attacked" by the victim. Id. at 40:17-21; see also id. at 48:7-17. Ross was also concerned that putting on a mental health defense would open the door to questioning about petitioner's history of methamphetamine abuse. Id. at 100:19-22. Once Ross made the decision to pursue a defense of self-defense, he did not obtain any other
/////

mental health records or conduct any further testing, despite the fact that one of his experts had recommended further testing and getting all of the records. Id. at 58:11-25.

"Once counsel reasonably selects a defense, it is not deficient performance to fail to pursue alternative defenses." Rios v. Rocha, 299 F.3d 796, 807 (9th Cir. 2002) (citing Bean v. Calderon, 163 F.3d 1073 (9th Cir.1998); Turk v. White, 116 F.3d 1264, 1267 (9th Cir.1997)). The record shows that petitioner's trial counsel had sufficient information about petitioner's mental health history, petitioner's version of events, and the gravity of the sentence petitioner faced if convicted, to render the choice to pursue an all-or-nothing chance at acquittal a reasonable, if risky, one. Counsel's tactical decisions concerning the defense in this case did not fall outside the wide boundaries of reasonably competent professional assistance. The state court's rejection of this claim was neither contrary to nor a unreasonable application of clearly established principles of federal law. This claim should be denied.

2. Failure to Call Witnesses re: Self-Defense

Petitioner's fourth claim is that his trial counsel was ineffective in failing to call witnesses who could have provided evidentiary support for petitioner's theory of self-defense. Had these witnesses been called, petitioner contends, the trial court's ruling on the sufficiency of evidence to support a self-defense instruction discussed supra would have been avoided. In support of this claim, petitioner has presented declarations from several individuals. See Ex. G to Second Amended Petition.

As discussed in section II.B, supra, absent from the record at the time the trial court ruled there was insufficient evidence to support a self-defense instruction was any evidence that petitioner actually believed he had to defend himself at the time he shot Carver. The only statement in any of the declarations that is relevant to this issue is the averment of petitioner's sister, Donna Pratt, that during phone calls the night before the shooting petitioner had told her "he was afraid something bad was going to happen to him" and that he thought Carver and Carver's father were "conspiring to try to kill" him. Ex. G to Second Amended Petition,

Declaration of Donna Pratt (Pratt Declaration) at ¶¶ 3-4. Respondent contends these statements are inadmissible hearsay. Respondent also contends that counsel had a reasonable tactical reason for not calling Ms. Pratt to testify because she was subject to impeachment through a criminal conviction for which she was on probation and because she had not told police "everything she knew" because of her "fear of a probation violation." Pratt Declaration at ¶ 12. Petitioner's trial counsel has averred that he "recall[s] speaking with her and that [he] believed that there was nothing she provided that I felt would add to the presentation of the case." Lodged Document 12, Declaration of Eric J. Ross lodged Jan. 11, 2006 (Ross Declaration) at ¶ 3.

This court finds no reasonable probability that either the trial court's ruling or the outcome of petitioner's trial would have been different had counsel called petitioner's sister as a witness. Even assuming arguendo that petitioner's alleged statements might have been admissible under a state-of-mind exception to the hearsay rule, see California Evidence Code § 1250, petitioner's alleged belief, expressed the night before the events at bar, that Carver and his father were "conspiring to try to kill him" is at odds with petitioner's repeated visits to Carver's apartment on November 8 to use the telephone to arrange a ride to Reno.[7] The state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. This claim should be denied.

3. Failure to Introduce Evidence Regarding Petitioner's Mental Health and Effect of Medications on his Demeanor Prior to His Testimony

Petitioner also claims that counsel was ineffective in failing to present evidence of petitioner's mental health status and the effect of medications on his demeanor prior to his testimony. In support of this claim, petitioner has presented declarations from several jurors attesting to the adverse impact petitioner's testimony and demeanor had on the defense. See Ex.

/////

---

[7] Carver's father was present at least two of the times petitioner came to the apartment on November 8.

A to Second Amended Petition. Citing Federal Rule of Evidence 605(b), respondent contends these declarations are inadmissible to impeach the verdict in this case.

For the reasons set forth in section II.B.1, supra, counsel had reasonable tactical reasons for not offering evidence of petitioner's mental health status. The evidence before the court does not show a reasonable probability that the outcome of the proceedings against petitioner would have been different had counsel tried to explain petitioner's demeanor in advance of his testimony. The state court's rejection of this claim was neither contrary to nor an unreasonable application of relevant principles of clearly established federal law. This claim should be denied.

### 4. Failure to Introduce Evidence of Petitioner's Employment History

Petitioner's sixth claim is that his trial counsel was ineffective in failing to present evidence that petitioner had worked for an organization called "Day Labor" to rehabilitate petitioner's credibility after cross-examination by the prosecution.

On cross-examination, the following exchange took place between the prosecutor and petitioner:

> Q    Four to five weeks, you were just hanging out at a hotel. What do you do with your time? Did you go get a job?
>
> A    Yeah.
>
> Q    Where did you work?
>
> A    I worked for Day Labor.
>
> Q    Day Labor, where is that?
>
> A    I don't know. That's where I got pulled over in Timmy's car. That's where I was going.
>
> Q    You didn't actually get a job, you just were going there?
>
> A    No, I worked there. I worked there. He sent me on two jobs, then I worked under the table behind for like a company that they didn't want. I went to work for them a second time. And they told me, don't tell Day Labor that you're going to come back here and work because they get a percentage or something.

| | | |
|---|---|---|
| 1 | Q | Let me guess, you don't have any receipts for any of that, right? |
| 2 | A | I'm sure they do. If you'd like to check you can. |
| 3 | Q | I'm asking, where are they? |
| 4 | A | In my wallet. They were confiscated at some time. |
| 5 | Q | Where is Day Labor located? Is this a company? |
| 6 | A | I'm not from Sacramento, sir. I don't even know where I am at, okay? |
| 7 | Q | Where did you go to high school? |
| 8 | A | I went to Folsom High School, eleventh grade. I never left Folsom. |
| 9 | Q | Do you have any idea where this place is that you went to work? |
| 10 | A | No, I don't. |
| 11 | Q | How about the place where you went and that they sent you out on a job; where is that? |
| 12 | A | Timmy is – I was with Timmy, and he went to work with me. |
| 13 | Q | I don't care who worked with you. I am asking you where is this? |
| 14 | A | I don't know. It's been a long time. I don't know. |
| 15 | Q | Just a name? |
| 16 | A | I don't know. It was a union job, that's all I know. |
| 17 | Q | Okay. You didn't really work anywhere, did you? We can impeach you on this. |
| 18 | A | I worked – I did work. There is documentation that Day Labor where – I have it to prove this. I can back up my claims, can you? |

  Q   Let me guess, you don't have any receipts for any of that, right?

  A   I'm sure they do. If you'd like to check you can.

  Q   I'm asking, where are they?

  A   In my wallet. They were confiscated at some time.

  Q   Where is Day Labor located? Is this a company?

  A   I'm not from Sacramento, sir. I don't even know where I am at, okay?

  Q   Where did you go to high school?

  A   I went to Folsom High School, eleventh grade. I never left Folsom.

  Q   Do you have any idea where this place is that you went to work?

  A   No, I don't.

  Q   How about the place where you went and that they sent you out on a job; where is that?

  A   Timmy is – I was with Timmy, and he went to work with me.

  Q   I don't care who worked with you. I am asking you where is this?

  A   I don't know. It's been a long time. I don't know.

  Q   Just a name?

  A   I don't know. It was a union job, that's all I know.

  Q   Okay. You didn't really work anywhere, did you? We can impeach you on this.

  A   I worked – I did work. There is documentation that Day Labor where – I have it to prove this. I can back up my claims, can you?

RT at 555-557. During closing argument, the prosecutor commented on the foregoing exchange in the context of arguing about the lack of corroborating evidence for petitioner's version of events:

> How about this, how about anybody from Day Labor to say yes, he used to work at Day Labor. He used to work here during this time when, in fact, he wasn't out committing burglaries? How about somebody saying he worked for us? How about a pay stub? How about to show that he worked a day during the day or two prior to this happening?

RT at 734.

Prior to sentencing, petitioner made a motion to relieve his attorney pursuant to People v. Marsden, 2 Cal.3d 118 (1970). During that hearing, counsel acknowledged that petitioner had given him a W-2 form that showed petitioner had earned "a hundred and fifty dollars at one point for working for Day Labor." RT at 857.[8] Counsel did not offer the W-2 into evidence because he thought it was "de minimis" and "not a substantial issue." Id.

After review of the record, this court finds that petitioner has failed to establish that he was prejudiced by counsel's failure to introduce this evidence of his employment history. Viewed in the context of the entire record, the question of petitioner's credibility concerning his employment history was indeed minimal and this court cannot find there is a reasonable chance that the outcome of petitioner's trial would have been different had counsel tendered this evidence. The state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Petitioner's sixth claim for relief should be denied.

### 5. Failure to Call Ballistics Expert in Support of Self-Defense Theory

Petitioner's seventh claim is that his trial counsel was ineffective in failing to call a ballistics expert to testify that the bullet wound suffered by the victim was consistent with petitioner's testimony that he shot the victim from below, in an upward direction. Petitioner points to testimony from the county coroner that the "directionality" of the bullet wound was "from down to up," and contends testimony from a defense ballistics expert would have

---

[8] The entire transcript of the Marsden hearing has been filed under seal provisionally. See Order filed February 21, 2006. Neither party has moved to maintain this transcript under seal permanently, and the court finds no reason why portions of that transcript relevant to the claim at bar cannot be cited in these findings and recommendations.

16

| | |
|---|---|
| 1 | "bolstered" petitioner's claim of self-defense. Second Amended Petition, at 23 (quoting RT at |
| 2 | 283). Petitioner has failed to present any evidence in support of this claim. It should be denied. |
| 3 |       6.   <u>Ineffective Assistance of Appellate Counsel</u> |
| 4 | Finally, petitioner claims that his appellate attorney was ineffective in failing to |
| 5 | raise on direct appeal the claims raised in Grounds Two and Seven of the Second Amended |
| 6 | Petition. For the reasons set forth in these findings and recommendations, those claims are |
| 7 | without merit. <u>A</u> <u>fortiori</u>, petitioner's appellate counsel was not ineffective in failing to raise the |
| 8 | claims on direct appeal. |
| 9 | For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that |
| 10 | petitioner's application for a writ of habeas corpus be denied. |
| 11 | These findings and recommendations are submitted to the United States District |
| 12 | Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen |
| 13 | days after being served with these findings and recommendations, any party may file written |
| 14 | objections with the court and serve a copy on all parties. Such a document should be captioned |
| 15 | "Objections to Magistrate Judge's Findings and Recommendations." Any response to the |
| 16 | objections shall be filed and served within fourteen days after service of the objections. The |
| 17 | parties are advised that failure to file objections within the specified time may waive the right to |
| 18 | appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991). |
| 19 | DATED: February 23, 2010. |

_____
UNITED STATES MAGISTRATE JUDGE

12
prat0872.157